UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MATTHEW PETTEY and ) 
ANNEMARIE PETTEY, )
 )
            Plaintiffs, )
 )
            v. )        No. 1:24-cv-00198-RLY-MJD
 )
INDIANA UNIVERSITY, )
THE BOARD OF TRUSTEES OF INDIANA )
UNIVERSITY; )
LIBBY SPOTTS, individually and as agent for )
Indiana University; )
GRETCHEN HANDLOS, individually and as )
agent for Indiana University; )
INDIANA UNIVERSITY POLICE )
DEPARTMENT; )
WYATT CHAUDION, in his individual and )
official capacity; and )
CHARLOTTE WATTS, in her individual and )
official capacity, )
 )
            Defendants. )

**ENTRY ON DEFENDANTS' MOTION TO DISMISS**

Plaintiff Matthew Pettey is a former Indiana University student who was taking

part in the 3/2 MBA program at the Kelley School of Business, which allows incoming

business students the opportunity to graduate with an MBA in 5 years.  On the evening

of January 30, 2022, Matthew and his sister, Annemarie Pettey, were playing ping pong

with two male students at a University-managed student residence property.  At some

point, an altercation ensued over money, and both Matthew and Annemarie were arrested

by Indiana University Police Department Officers ("IUPD") Wyatt Chaudion and

Charlotte Watts for, among other things, robbery (Matthew) and theft (Annemarie). The charges against Matthew and Annemarie were later dismissed by the Monroe County Prosecutor's Office. Although Matthew was allowed to finish his undergraduate coursework, he was not accepted back into the Kelley School's MBA program.

In their First Amended Complaint, Matthew and Annemarie assert a variety of Fourth, Fifth, Sixth, and Fourteenth Amendment claims under 42 U.S.C. § 1983 against the Defendants herein, Indiana University; Board of Trustees of Indiana University; Associate Dean of Students, Libby Spotts; Executive Director of Accounting Programs, Gretchen Handlos; the IUPD; and IUPD Officers Chaudion and Watts. They also bring supplemental state law claims for breach of contract, promissory estoppel, and false arrest.

Defendants now move to dismiss Plaintiffs' First Amended Complaint with prejudice. For the reasons explained below, the court **GRANTS in part** Defendants' Motion to Dismiss and **RELINQUISHES** jurisdiction over Plaintiffs' state law claims for breach of contract and promissory estoppel. Defendants also request oral argument. That request is **DENIED**.

## I.    Background

### A.    The Incident

On January 30, 2022, Annemarie, a graduate student at the University of Wisconsin-Madison, was visiting her brother, Matthew. (Filing No. 36, Am. Compl. ¶ 18). Matthew and Annemarie decided to go out that evening with friends. (*Id.* ¶ 21). They ended up playing games with two other male students, known in the Amended

Complaint as "Accuser 1" and "Accuser 2," in a game room located at the Avenue on College Apartments. (*Id.*). At the time, the Avenue on College was a University-managed student residence property. (*Id.* ¶ 22). During a game of ping pong, Matthew engaged in a verbal dispute with the Accusers because they took $50 from his wallet. (*Id.* ¶ 23). The money allegedly belonged to Annemarie. (*Id.*).

After Matthew and Annemarie left the premises with the $50, the Accusers called the IUPD. (*Id.* ¶ 27). IUPD Officers Chaudion and Watts arrived at the scene and spoke to the Accusers. They told the officers that "Matthew demanded the return of his $50, and in the process, laid hands on each of them and choked Accuser 2." (*Id.*). The officers located Matthew outside the apartment building. (*Id.* ¶ 28). He was taken into custody at the IUPD station for questioning. (*Id.*). Matthew was charged with robbery, strangulation, and public intoxication and transported to the Monroe County Jail. (*Id.* ¶¶ 35, 38). After approximately 30 hours, he was released to the custody of his parents. (*Id.* ¶ 38).

Shortly after Matthew's arrest, Officer Watts called Annemarie on her personal cell phone, without identifying herself as a police officer, and asked Annemarie to come back for her brother. (*Id.* ¶ 29). When Annemarie returned, she was detained by IUPD. (*Id.* ¶ 36). During a search of Annemarie's person, IUPD discovered a single loose prescription pill in Annemarie's pocket. (*Id.*). Annemarie alleges she had a prescription for the pill in her pocket. (*Id.*). The officers charged Annemarie with theft and possession of a Legend Drug and transported her to the Monroe County Jail. (*Id.* ¶ 37). She was detained for a total of five hours. (*Id.* at ¶ 1).

**B.    Matthew's Suspension from the University**

The University summarily suspended Matthew on January 31, 2022, and banned him from attending classes.  (*Id.* ¶ 40).  Matthew requested a Summary Suspension Formal Hearing, which took place on March 25, 2022.  (*Id.* ¶ 41).  During the Formal Hearing, a three-member panel considered evidence to determine "whether it was 'more likely than not' that a policy violation that is a threat to campus safety occurred."  (*Id.* ¶ 46).

The Hearing Panel considered the statements from the Accusers, a statement from an anonymous witness, and the police reports regarding the Incident.  (*Id.* ¶ 42).  The anonymous witness was not disclosed or brought to the Formal Hearing, and the statement by the anonymous witness revealed that he or she did not witness the altercation between Matthew and the Accusers.  (*Id.* ¶ 47).  The police reports contain only the version of events as described by the Accusers because Matthew declined to speak with IUPD without a lawyer present.  (*Id.* ¶ 44).  Moreover, the police reports mention that security camera footage existed within the game room, but that footage was never viewed by IUPD or provided to Matthew or to the Monroe County Prosecutor's Office.  (*Id.* ¶ 32).  The University ultimately claimed the footage was lost or destroyed.  (*Id.*).  Therefore, the Hearing Panel did not have the opportunity to view what occurred between Matthew and the Accusers.  (*Id.* ¶ 45).  Matthew denied the Accusers' accusations of physical violence.  (*Id.* ¶ 47).

Following the Formal Hearing, the Hearing Panel determined, based on a preponderance of the evidence, that it was more likely than not that Matthew had violated

University policy. (*Id.* ¶ 48). Matthew was suspended from the University for a period of one year. (*Id.* ¶ 49).

In September 2022, due to a lack of credible evidence, the Monroe County Prosecutor dismissed the charges against Matthew and Annemarie. (*Id.* ¶ 49). Matthew applied to Dean Spotts[1] to have the suspension lifted. (*Id.*). Dean Spotts summarily denied his application, stating that the dismissal of the charges had no effect on his one-year suspension. (*Id.*).

### C.    Matthew Reapplies to the University

On February 1, 2023, Matthew submitted a Statement for Readmission, seeking reinstatement to the Kelley School of Business 3/2 program. (*Id.* ¶ 50). His application was granted on March 10, 2023. (*Id.*). Matthew was able to re-enroll in courses necessary to complete his undergraduate coursework, but he was not permitted to re-enroll in any MBA courses. (*Id.* ¶ 53).

In the spring of 2023, Matthew contacted Gretchen Handlos, Executive Director of Graduate Accounting Programs for the Kelley School of Business, and asked how he could be reinstated into the 3/2 Program to complete his studies. (*Id.* ¶ 54). Handlos informed Matthew that he would need to apply as a new student, even though he had already completed some of his 3/2 MBA studies. (*Id.*). Matthew then reapplied for fall 2023 admission into the 3/2 MBA Program. (*Id.* ¶ 56). His application was denied on September 7, 2023. (*Id.* ¶ 58).

---

[1] Dean Spotts is also the University's Director of Student Conduct and the Deputy Title IX Coordinator. (Am. Compl. ¶ 49).

Matthew received his undergraduate degree from the Kelley School of Business in December 2023.  (*Id.* ¶ 59).

## II.    Discussion

### A.    Improper Parties

Defendants seek dismissal of the University, the Trustees, and the IUPD as improper parties for two reasons.  First, they are immune from suit under the Eleventh Amendment and second, they are not "persons" subject to suit within the meaning of 42 U.S.C. § 1983.

### 1.    Sovereign Immunity as to the University, the Trustees, and IUPD

Under the Eleventh Amendment, states, state agencies, and state employees acting in their official capacities enjoy immunity from lawsuits in federal court unless the state consents to the suit or Congress abrogates its immunity.  *Tucker v. Williams*, 682 F.3d 654, 658 (7th Cir. 2012); *Patton v. Ind. Univ. Bd. of Trs.*, No. 1:20-cv-00699-TWP-MJD, 2022 WL 3716522, at *6 (Aug. 29, 2022) (citing *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 695 (7th Cir. 2007)).  Neither exception to Eleventh Amendment immunity applies here.

"Section 1983 does not disturb the states' Eleventh Amendment immunity." *Patton*, 2022 WL 3716522, at *6.  Only persons are subject to suit under § 1983, and "states and state agencies are not 'persons' under Section 1983."  *Id.* (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989)).  The University is an arm of the state and, as such, is not a suable "person" under § 1983.  *Sebesta v. Davis*, 878 F.3d 226, 231 (7th Cir. 2017) ("The University is an arm of the state, and states are not 'persons' covered by

6

the statute.").  Neither are the Trustees, *Peirick*, 510 F.3d at 695, or the IUPD, which is a division of the University,[2] Ind. Code § 21-39-4-2.  Accordingly, Plaintiffs' Section 1983 claims against the University, the Trustees, and the IUPD are dismissed.

### 2.    Official Capacity Claims Against the Individual Defendants

Defendants also argue that sovereign immunity bars Plaintiffs' Section 1983 *Monell* claims against the official-capacity Individual Defendants for monetary damages. They are correct.  *Haynes v. Ind. Univ.*, 902 F.3d 724, 731 (7th Cir. 2018).  However, "[u]nder the longstanding doctrine of *Ex Parte Young*, a private party can sue a state officer in his or her official capacity to enjoin prospective action that would violate the federal law.'"  *Brown v. Budz*, 398 F.3d 904, 917–18 (7th Cir. 2005) (quoting *Dean Foods Co. v. Brancel*, 187 F.3d 609, 613 (7th Cir. 1999)).

Here, Plaintiffs attempt to invoke the doctrine of *Ex parte Young*, but their efforts fail because they do not request injunctive relief in their prayers for relief.  Instead, they specifically request monetary damages and "such other relief as this Court deems just and proper."  (*See, e.g.*, Am. Compl., Count I, Prayer for Relief).  The court declines to interpret Plaintiffs' general catch-all request for relief as a prayer for injunctive relief. Thus, the official capacity claims against the Individual Defendants sued in their official capacities under § 1983 are dismissed.

Accordingly, the following claims are dismissed: Count III, Matthew's Fifth and Sixth Amendment right-to-counsel claim against Officer Watts, in her official capacity,

---

[2] Defendants mistakenly argue that the IUPD is tantamount to a municipal police department like the Indianapolis Metropolitan Police Department.  (Filing No. 45, Defs.' Mem. in Supp. at 7).

and the University; Count IV, Matthew's Fifth and Sixth Amendment right-to-counsel claim against Officer Chaudion, in his official capacity, and the University; Count V, Matthew's Fourteenth Amendment due process claim against the University[3]; Counts VII, Annemarie's Fourth Amendment false arrest claim against Officer Watts, in her official capacity, and the University; Count VIII, Annemarie's Fourth Amendment false arrest claim against Officer Chaudion, in his official capacity, and the University; Count IX, Annemarie's Fourteenth Amendment due process claim against Officer Watts, in her official capacity, and the University; and Count X, Annemarie's Fourteenth Amendment due process claim against Officer Chaudion, in his official capacity, and the University.

### B.    Plaintiffs' Federal Claims

### 1.    Section 1983 Claims Against the Individual Defendants

Plaintiffs bring their federal claims under 42 U.S.C. § 1983, which provides a cause of action to redress the violation of federally secured rights by a person acting under color of state law. *Bell v. City of Milwaukee,* 746 F.2d 1205, 1232 (7th Cir. 1984). To state a claim under § 1983, a plaintiff must satisfy two elements: (1) he must allege a violation of rights secured by the Constitution or laws of the United States, and (2) he must show that the alleged deprivation was committed by a person acting under color of state law. *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). There is no dispute that the officers were acting under color of law. The court's discussion will therefore address whether the officers violated Matthew's and Annemarie's constitutional rights.

---

[3] Count V is also against Dean Spotts, in her official capacity. Unlike the other official capacity claims, Count V seeks injunctive relief against Dean Spotts.

### a.    Matthew's Fifth Amendment Claims (Counts I and II)

In Counts I and II of his Amended Complaint, Matthew alleges that Officer Watts and Officer Chaudion, in their individual capacities, violated his Fifth Amendment right to counsel and his Fifth Amendment right against self-incrimination.  Specifically, Matthew alleges that, following his arrest, he told the officers he would not speak to them about the Incident without a lawyer present.  When Matthew asked to call a lawyer, the officers denied his request, so he remained silent.  As a result, the police reports prepared by the officers contain only the Accusers' version of what transpired on January 30, 2022. "The fact that these police reports were later used against Matthew is a deprivation of Matthew's right not to incriminate himself."  (Filing No. 57, Pls.' Resp. at 8).

### i.    Right to Counsel

The "right to remain silent" and the "right to the presence of an attorney" during custodial interrogations was announced by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), as part of the now-familiar *Miranda* warnings.[4]  *Dickerson v. United States*, 530 U.S. 428, 435 (2000).  The purpose of these warnings is to protect a suspect's Fifth Amendment right against self-incrimination through coercive custodial interrogation.  *Johnson v. Winstead*, 900 F.3d 428, 434 (7th Cir. 2018) ("*Miranda* warnings and the corollary exclusionary rule are 'prophylactic measure[s] to prevent violations of the right protected by the text of the Self-Incrimination Clause—the

---

[4]  In *Miranda*, the Supreme Court held that during custodial interrogation, a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney[,] one will be appointed for him prior to any questioning if he so desires."  384 U.S. at 479.

admission into evidence in a criminal case of confessions obtained through coercive custodial questioning.'" (quoting *Chavez v. Martinez*, 538 U.S. 760, 772 (2003))).  A suspect's invocation of his right to counsel only requires that a custodial interrogation cease until his attorney is present.  *Miranda*, 384 U.S. at 474.  Consequently, a suspect's denial of the right to counsel "is not a stand-alone constitutional claim." *Dukes v. Washburn*, 600 F. Supp. 3d 885, 897 (N.D. Ill. 2022) ("A claim based on the deprivation of a plaintiff's right to counsel is . . . not the source of a stand-alone constitutional claim, because the right to counsel is derived from the holding of *Miranda*.").  Therefore, the alleged deprivation of Matthew's right to counsel does not amount to a Fifth Amendment violation.  Matthew's Fifth Amendment right to counsel claim is dismissed.

### ii.    Right Against Self-Incrimination

A violation of a suspect's right against self-incrimination "occurs when an accused's unlawfully obtained confession is introduced as evidence to convict him in a criminal case." *Johnson*, 900 F.3d at 431; *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1025 (7th Cir. 2006) ("In the paradigmatic *Miranda* case, the Fifth Amendment is violated when a criminal defendant's *Miranda*-infirm statements are admitted as evidence against him in the prosecution's case-in-chief at criminal trial.").

As the Amended Complaint makes clear, Matthew was not coerced by the officers to confess to any criminal acts during his detention.  When Matthew learned he could not contact a lawyer, he remained silent.  (Pls.' Resp. at 8 (explaining that the only "statement" from Matthew to the IUPD officers was "silence")).  Consequently, Matthew

successfully invoked his right to silence, receiving the protections under the Fifth Amendment.

Even if Matthew had been coerced to confess, the Amended Complaint identifies no criminal case in which his testimony would have been introduced into evidence. As the Amended Complaint confirms, Matthew's criminal charges were dismissed and expunged. (Am. Compl. ¶ 39). Therefore, Matthew's claim based on the Self-Incrimination Clause of the Fifth Amendment is dismissed.

### 2.    Matthew's Sixth Amendment Claims (Counts I & II)

In Counts I and II, Matthew also asserts Officers Watts and Officer Chaudion violated his Sixth Amendment right to counsel. In his Response, Matthew changes course and argues that his Sixth Amendment right to a fair hearing was violated. Under either scenario, his claims against the officers cannot survive.

### a.    Right to Counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Sixth amendment right to an attorney, and the auxiliary right to make a phone call to obtain legal assistance, does not attach until "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).

Here, Matthew does not allege any facts that suggest that his right to counsel attached for purposes of the Sixth Amendment during his interactions with the officers, as

no adversary judicial criminal proceedings commenced at the time he asked to speak to a lawyer. *Moran v. Burbine*, 475 U.S. 412, 428–29 (1986) (holding a custodial interrogation conducted before charging does not violate a defendant's Sixth Amendment right to counsel); *Watson v. Hulick*, 481 F.3d 537, 542 (7th Cir. 2007) ("[I]nterrogation of a suspect before the filing of a charge, without more, does not trigger the right to counsel."). Therefore, Matthew's Sixth Amendment right-to-counsel claims are dismissed.

**b.    Right to a Fair Trial**

Matthew contends his Sixth Amendment due process right to a fair suspension hearing was violated because the three-member Hearing Panel relied on faulty evidence.

"By its terms, the Sixth Amendment applies only to 'criminal prosecutions.'" *United States v. Carpenter*, 104 F.4th 655, 657 (7th Cir. 2024) (citing U.S. Const. amend. VI). A disciplinary hearing in an educational setting, like Matthew's Formal Hearing, is not a "criminal prosecution" within the meaning of the Sixth Amendment. *See Linwood v. Bd. of Educ. of City of Peoria, Sch. Dist. No. 150*, 463 F.2d 763, 770 (7th Cir. 1972) ("Due process in the context [of an expulsion hearing] is not to be equated . . . with that essential to a criminal trial or a juvenile court delinquency proceeding."); *Foo v. Trs., Ind. Univ.*, 88 F. Supp. 2d 937, 948–49 (S.D. Ind. 1999) (discussing Seventh Circuit case law regarding what process is due in expulsion cases, and explaining it required only the "opportunity to be heard 'at a meaningful time and in a meaningful manner'" (quoting *Linwood*, 463 F.2d at 770)). Therefore, Matthew's Sixth Amendment due process claims based on his Formal Hearing are dismissed.

### 3.    Matthew's Fourteenth Amendment Due Process Claims (Counts V & VI)

In Counts V and VI, Matthew alleges that Dean Spotts, in both her official (Count V) and individual capacity (Count VI), violated his right to due process of law under the Fourteenth Amendment.  In Count V, he seeks injunctive relief.

"The Due Process Clause of the Fourteenth Amendment forbids a state to deprive any person of 'life, liberty, or property, without due process of law.'"  *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005) (quoting U.S. Const. amend. XIV, § 1).  In evaluating such a claim, the court engages in a two-step analysis.  *Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 536 (7th Cir. 2023).  "First, the court must identify the liberty or property interest at stake.  Second, if the plaintiff was deprived of one of those interests, the court must determine what process is due under the circumstances."  *Id.*

### a.    Official Capacity Claim Against Dean Spotts

Matthew alleges he has property interest in his continued education at the University because he paid tuition.  (Am. Compl. ¶¶ 94, 98).  Under Seventh Circuit law, a student does not have "a stand-alone property interest in an education at a state university."  *Charleston v. Bd. of Trs. of Univ. of Ill. at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013).  This is because, "unlike with grade schools, the law does not entitle each person to an education at a public university."  *Malhotra*, 77 F.4th at 537.  Instead, he must show he has a "*legally protected entitlement* to his continued education at the university" by pleading the existence of an express or implied contract with the university.  *Charleston*, 741 F.3d at 773 (emphasis in original).  "[T]o demonstrate that

he possesses the requisite property interest, a university student must do more than show he has a contract with the university; he must establish that the contract entitled him to the specific right that the university allegedly took, 'such as the right not to be suspended without good cause.'"  *Doe v. Purdue Univ.*, 928 F.3d 652, 660 (7th Cir. 2019) (quoting *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009)).  "Generalities won't do; 'the student's complaint must be specific about the source of this implied contract, the exact promises the university made to the student, and the promises the student made in return.'"  *Id.* (quoting *Charleston*, 741 F.3d at 773).

Here, Matthew alleges the University had policies providing that students are entitled to a fair and impartial disciplinary process.  (Am. Compl. ¶¶ 100, 161).  Nevertheless, the University, acting through Dean Spotts, failed to provide him a fair and impartial hearing.  (*Id.* ¶ 101).  Matthew alleges he was not given a "fair chance . . . to tell his side of the story," and he was not afforded the opportunity to cross-examine the Accusers or to confront the anonymous witness.  (*Id.* ¶¶ 101–03).

Matthew does not identify the University policies which were allegedly violated, nor does he describe the specific contractual promises the University made to him through its disciplinary policy.  Instead, he appears to be claiming that the University promised him the procedures set forth in the University's disciplinary policy.  (*See id.* ¶ 100 ("Matthew was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged physical altercation."); *id.* ¶ 101 ("Defendants violated Matthew's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the requirements of procedural fairness[.]")).  But

14

a "plaintiff does not have a federal constitutional right to state-mandated process."

*Charleston*, 741 F.3d at 773 (citing *Olim v. Wakinekona*, 461 U.S. 238, 250–51 (1983)

("Process is not an end in itself . . . The State may choose to require procedures . . . but in

making that choice the State does not create an independent substantive right.")).  "It may

have been unfair for the university not to follow its own procedures in [Matthew's] case,

but it was not unconstitutional."  *Id*. at 774.  Therefore, Matthew's Fourteenth

Amendment claim against Dean Spotts in her official capacity is dismissed.

> **b.    Individual Capacity Claim Against Dean Spotts**

In Matthew's individual capacity claim against Dean Spotts, he alleges she

"engaged in actions which caused Matthew to be wrongfully suspended from the

University, denying him the benefits of an education at his chosen school"; "facilitated a

Formal Hearing which failed to provide Matthew with basic due process protections";

and "unilaterally determined that Matthew's suspension should remain in effect despite

learning that the Monroe County Prosecutor's office dismissed all charges against

Matthew."  (Am. Compl. ¶¶ 113–15).

Matthew's individual capacity claim against Dean Spotts fails for the same reason

as his official capacity claim—he has not sufficiently alleged the violation of a property

interest.  He alleges only that Dean Spotts "den[ied] him the benefits of an education at

his chosen school."  (*Id.* ¶ 113).  Therefore, Matthew's individual capacity claim[5] is

subject to dismissal.

---

[5] Even if Matthew had sufficiently alleged the deprivation of a property interest, the court does
not see how Dean Spotts could be personally liable.  She is not a party to any alleged contract

### 4.    Annemarie's Fourth Amendment Claims (Counts VII & VIII)

In Counts VII and VIII, Annemarie brings a Fourth Amendment false arrest claim against Officer Watts and Officer Chaudion in their official capacities. Defendants argued, and the court agreed, that this *Monell* claim could not be brought in the officers' official capacities. (*See* Section II.A.2). But Defendants also argued this claim as though it was brought in the officers' individual capacities. Therefore, in an abundance of caution, the court will address this claim as though it was also brought in the officers' individual capacities.

Annemarie alleges Officer Watts and Officer Chaudion arrested her without probable cause. In her Response, Annemarie does not directly attack the validity of her arrest. Instead, she argues the officers had no reasonable suspicion to engage her in a *Terry* stop, and thus, no valid basis to frisk her.

The Fourth Amendment prohibits unreasonable searches and seizures by law enforcement. U.S. Const. amend. IV. Generally, a warrantless arrest is "'reasonable' only if based on probable cause to believe that the individual has committed a crime." *Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019) (quoting *Bailey v. United States*, 568 U.S. 186, 192 (2013)).

---

between the University and Matthew. And were Matthew to prevail at trial, the state would be liable for the monetary judgment. Therefore, Matthew's § 1983 claim is not "a bona fide individual capacity suit." *Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003) (noting that because plaintiff sought "monetary compensation based on an employment contract, we think it so inescapable that any resulting judgment will be paid by the state rather than the individual defendants that this bears no resemblance to a bona fide individual capacity suit. (The individuals, after all, were not even parties to the contract in their individual capacity.)").

An officer may conduct an investigatory stop if that officer has reasonable suspicion supported by articulable facts that criminal activity is afoot. *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). Reasonable suspicion is more than a hunch but less than probable cause, and it requires only an objective justification for making a stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). When determining whether reasonable suspicion exists, courts must assess the "'totality of the circumstances' to assess whether the detaining officer has a 'particularized and objective basis' for suspecting illegal activity." *United States v. Zambrana*, 428 F.3d 670, 675 (7th Cir. 2005) (quoting *United States v. Arvizu* 534 U.S. 266, 273 (2002)).

Annemarie's Amended Complaint alleges that (1) Matthew and the Accusers got into a physical altercation over $50; (2) Annemarie "obtained the return of the $50 from the Accusers"; (3) Matthew and Annemarie then "left the premises"; and, after they left, (4) the Accusers called IUPD and told the officers that "Matthew demanded the return of the $50, and in the process, laid hands on each of them and choked Accuser 2." (Am. Compl. ¶¶ 23–27). This is sufficient justification to engage Annemarie in a *Terry* stop to determine her involvement in the alleged criminal activity.

Moreover, the frisk of Annemarie was objectively reasonable. "Though not every *Terry* stop justifies a frisk, some crimes by their very nature are so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime." *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007). Such crimes include robbery, in which

17

Annemarie was implicated.  *Mwangangi v. Nielsen*, 48 F.4th 816, 826 (7th Cir. 2022).

Therefore, Annemarie's Fourth Amendment claims must be dismissed.

### C.    State Law Claims

Because Plaintiffs' federal claims have been dismissed, the court must decide

whether to exercise supplemental jurisdiction over Plaintiffs' Indiana state law claims for

breach of contract (Count XI), promissory estoppel (Count XII), and false arrest (Counts

XIII & IV).

Normally, when "all federal claims are dismissed before trial, the district

court should relinquish jurisdiction over pendant state-law claims rather than resolving

them on the merits." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994).

Two recognized exceptions to this rule are when "substantial judicial resources have

already been committed, so that sending the case to another court will cause a substantial

duplication of effort" or "when it is absolutely clear how the pendent claims can be

decided." *Id.*

Here, the case is in its infancy, so there is no substantial risk of duplication of

effort by the state court regarding Matthew's breach of contract and promissory estoppel

claims.  Therefore, the court relinquishes supplemental jurisdiction over those claims.

However, the court finds the resolution of the Annemarie's false arrest claims is clear.

Therefore, the court will exercise supplemental jurisdiction over those claims.

Annemarie brings false arrest claims against Officer Watts (Count XIII) and

Officer Chaudion (Count XIV) in their individual capacities.  Defendants argue these

claims must be dismissed because she failed to comply with the notice provisions of the Indiana Tort Claims Act ("ITCA"). Ind. Code § 34-13-3 *et seq*.

Under the ITCA, a tort claim against a political subdivision is barred unless notice is filed with the governing body of that political subdivision—here, the University— within 180 days after the loss occurred, which, in this case, is January 30, 2022. Ind. Code § 34-13-3-8; *Seye v. Trs. of Ind. Univ.*, 830 F. App'x 778, 779 (7th Cir. 2020) (explaining that the university received a notice of tort claim pursuant to the ITCA). The ITCA also applies when the party sued is an employee of that political subdivision. *Davidson v. Perron*, 716 N.E.2d 29, 34 (Ind. Ct. App. 1999) (citing *VanValkenburg v. Warner*, 602 N.E.2d 1046, 1048 (Ind. Ct. App. 1992)).

A plaintiff must prove compliance with the ITCA before trial. *Brown v. Alexander*, 876 N.E.2d 376, 383 (Ind. Ct. App. 2007). The failure to do so creates an affirmative defense of noncompliance. *Id.* Once a defendant raises the affirmative defense in a responsive pleading, the burden shifts to the plaintiff to prove compliance. *Id.* at 384. If the plaintiff does not respond to defendant's argument with evidence of compliance, the claim should be dismissed. *See Gibson v. Carrington*, No. 1:20-cv-02812-SEB-DLP, 2021 WL 1667036, at *2 (S.D. Ind. Apr. 27, 2021) (granting partial motion to dismiss because "Mr. Gibson's complaint includes no allegations to plausibly suggest that he has complied with the requirements of the Indiana Tort Claims Act and he has not come forth with any evidence of compliance in response to Defendants' motion to dismiss").

19

Defendants argue that Annemarie never gave notice to the University of her tort claims against Officer Watts and Officer Chaudion.  Although Annemarie was not required to plead facts showing she filed a notice of her tort claim with the University in her Amended Complaint, once the officers raised the issue, Annemarie was required to provide evidence of notice in her response.  Annemarie has not done so.  Indeed, Annemarie ignored this argument in her Response.  Therefore, Annemarie's false arrest claims against Officer Watts and Officer Chaudion are barred.

### D.    Leave to Amend

Defendants argue Plaintiffs' claims should be dismissed with prejudice, as leave to amend would be futile.  Plaintiffs do not address this argument and, as such, the court concludes that Plaintiffs waived the argument.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (concluding that "failure to respond to an argument—as [is the case here]—results in waiver").  Regardless, on the merits, the court finds dismissal of Counts I–X, XIII & XIV should be with prejudice, as Plaintiffs cannot amend their Complaint to state viable claims for relief.

### III.    Conclusion

Accordingly, Defendants' Motion to Dismiss is **GRANTED in part** (Filing No. 44).  The motion is **GRANTED** on Counts I-X, XIII and XIV **with prejudice**.  The court **RELINQUISHES JURISDICTION** over Counts XI and XII, Matthew's state-law claims for breach of contract and promissory estoppel.  Defendants' Request for Oral

Argument (Filing No. 46) is **DENIED**.  Final judgment shall issue forthwith.


**SO ORDERED** this 6th day of December 2024.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.